522 S.E.2d 357

**BELK OF SPARTANBURG, S.C., INC., Respondent,**

**v.**

**Carolyn T. THOMPSON and Mary E.S. Hanahan, of whom Carolyn T. Thompson, is Appellant.**

No. 3040.

Court of Appeals of South Carolina.

Heard June 8, 1999.

Decided Aug. 30, 1999.

---

Stephen P. Groves, Sr., Thomas S. Tisdale, Jr., and Stephen L. Brown, all of Young, Clement, Rivers & Tisdale, of Charleston; and William I. Belk, of The Belk Group; and Robert N. Burris, of Burris, McMillan, Pearce & Mayer, both of Charlotte, North Carolina, for appellant.

Benjamin A. Johnson and Stephen M. Cox, both of Robinson, Bradshaw & Hinson, of Rock Hill; and A. Ward McKeithen, of Robinson, Bradshaw & Hinson, of Charlotte, North Carolina, for respondent.

CURETON, Judge:

In this stock valuation proceeding brought pursuant to S.C.Code Ann. § 33–13–300 (1977), appellant-stockholder Carolyn T. Thompson (Thompson) appeals the trial court's valuation of her stock in respondent Belk of Spartanburg, S.C., Inc. We affirm as modified.

## FACTS/PROCEDURAL HISTORY

Belk Department Store of Spartanburg, S.C., Inc. ("BDS") decided to merge with Belk's Department Store of Clinton, S.C., Incorporated. The merger was effective October 5, 1996, and the resulting corporation was re-named Belk of Spartanburg, S.C., Inc. ("BOS").

At the time of the merger, Thompson and Mary Hanahan owned 90 and 18.5 shares, respectively, of BDS. Thompson

and Hanahan (the dissenters) exercised their right to dissent from the merger and obtain payment of the "fair value" of their shares under S.C.Code Ann. § 33–13–102(A) (1990 & Supp.1998).[1] By letters dated October 4, 1996, BDS tendered payment of $1,474.99 per share to Thompson and Hanahan as an "estimate of fair value ... based upon the last two known transactions in the stock of [BDS]."

The dissenters disputed the value assigned by BDS, and demanded additional payment pursuant to S.C.Code Ann. § 33–13–280 (1990).[2] Thereafter, under Section 33–13–300 (1990),[3] BOS brought an action petitioning the court to determine the fair value of the dissenters' BDS shares.

BOS and the dissenters presented a total of three experts: B. Perry Woodside, III; Winston W. Way, Jr.; and Andrew Crawford Clarkson, Jr. The experts' proposed valuations

1. Section 33–13–102(A) provides in pertinent part:

 A shareholder is entitled to dissent from, and obtain payment of the fair value of, his shares in the event of any of the following corporate actions:

 (1) consummation of a plan of merger to which the corporation is a party (i) if shareholder approval is required for the merger by Section 33–11–103 or the articles of incorporation and the shareholder is entitled to vote on the merger or (ii) if the corporation is a subsidiary that is merged with its parent under Section 33–11–104 or 33–11–108 or if the corporation is a parent that is merged with its subsidiary under Section 33–11–108; ...

2. Section 33–13–280(a) provides in part:

 A dissenter may notify the corporation in writing of his own estimate of the fair value of his shares and amount of interest due and demand payment of his estimate (less any payment under Section 33–13–250) or reject the corporation's offer under Section 33–13–270 and demand payment of the fair value of his shares and interest due, if the:

 (1) dissenter believes that the amount paid under Section 33–13–250 or offered under Section 33–13–270 is less than the fair value of his shares or that the interest due is calculated incorrectly; ....

3. Under Section 33–13–300(a),

 If a demand for additional payment under Section 33–13–280 remains unsettled, the corporation shall commence a proceeding within sixty days after receiving the demand for additional payment and petition the court to determine the fair value of the shares and accrued interest. If the corporation does not commence the proceeding within the sixty-day period, it shall pay each dissenter whose demand remains unsettled the amount demanded.

ranged widely, from BOS's expert's valuation of $1,435.31 per share to the dissenters' appraisal of $7,930.30 per share. The trial court accepted the valuation of BOS's expert with only a slight modification. It awarded the dissenters $1,462.36 per share, but because this valuation was below that previously paid to the dissenters, the court concluded the dissenters were due no additional sums from BOS. Thompson appealed the trial court's valuation decision, and also its decision to deny her request to depose John Belk.

## LAW/ANALYSIS

### I. Standard of Review

■ A stock valuation is essentially an equitable proceeding, tried by the judge alone, and therefore this court is empowered to find facts in accord with our own view of the preponderance of the evidence. *Metromont Materials Corp. v. Pennell,* 270 S.C. 9, 239 S.E.2d 753 (1977). *See also Defender Properties, Inc. v. Doby,* 307 S.C. 336, 415 S.E.2d 383 (1992).

### II. Trial Court's Valuation

On appeal Thompson argues the trial court's valuation was incorrect because the evidence demonstrated the "fair market value" of BDS stock "far exceeded" the court's value of $1,462.36 per share. Thompson maintains the court committed a number of errors, which we will address seriatim.

A. Dissenters' Experts.

1. Experts' Reliance on Santee Oil Co. v. Cox:

■ Initially, we note neither of the dissenters' experts utilized all three of the major methods sanctioned by the supreme court in the seminal case of *Santee Oil Co. v. Cox,* 265 S.C. 270, 217 S.E.2d 789 (1975).[4] However, Thompson

---

4. Although Way and Clarkson did determine an earnings value, we dispute their calculations. The court in *Santee* stated, "An accepted method of determining the capitalization, or stock value, of a corporation is to multiply its earnings by an appropriate multiplier (price/earnings ratio)." *Santee Oil Co.,* 265 S.C. at 276, 217 S.E.2d at 793. However, the *Santee* court utilized the average of three years earnings;

goes to great lengths to convince us that the methods utilized by the dissenters' experts, Way and Clarkson, were appropriate.

■ For the purpose of a judicial valuation of shares under Section 33–13–300, "fair value" is defined as "intrinsic value." *Id.* "[T]he trial court must undertake to compute the fair value by establishing 'the fair market value of the corporate property as an established and going business.'" *Id.* at 273, 217 S.E.2d at 791 (citation omitted). The court is not restricted to any one method of valuation, and each case must be decided on its own facts and circumstances. *Id.*

In *Santee* our supreme court determined three factors were ordinarily to be considered in a stock valuation case: (1) net asset value, (2) market value, and (3) the earnings or investment value of the dissenting stock.[5] *Id.; McDuffie v. O'Neal,* 324 S.C. 297, 476 S.E.2d 702 (Ct.App.1996). After these factors have been considered, each is then weighted as to their relative bearing upon the ultimate determination of the fair value of the dissenting stock. *Santee Oil Co.,* 265 S.C. 270, 217 S.E.2d 789. Not only did the dissenters' experts not utilize all three of these methods, they also did not engage in weighting. Because Way and Clarkson failed to engage in a *Santee* analysis, we must accordingly discount the significance of their appraisals in valuing Thompson's shares.

### 2. The Belk Family of Stores:

■ We also find it problematic that the dissenters' experts used valuation methods which employ "multiples" derived

Way used only one year. Further, as noted hereinafter, we do not believe it is appropriate on this record to use a multiple derived from large multi-state chains as Way did. Clarkson, on the other hand, utilized figures from three years, but used Dillards, J.C. Penney, Sears and J.B. White, large multi-state chains, to derive his multiple. Clarkson further fouled his calculations by multiplying the resulting value by the price-to-book ratio derived from these stores.

5. The *Santee* court noted that each of these "major factors" involved various subfactors, including the nature of the enterprise; leverage; discount; management; earnings and dividends; expenses of operation; particular stockholdings in portfolio; and the entity's tax situation. *Santee Oil Co.,* 265 S.C. 270, 217 S.E.2d 789.

from large, publicly traded department store chains.[6] On this record, Thompson has not convinced us that BDS should be evaluated as merely two stores in a large regional department store chain.

Each of the stores in the Belk organization is owned by a closely-held corporation whose stock is held mostly by descendants of the founders, W.H. Belk and Dr. John M. Belk. In the instant case, BDS's assets consisted of two Belk stores located in Spartanburg, one in Hillcrest Mall and one in Westgate Mall.

Although this much is clear from the record, the remaining details as to the overall Belk organization are murky. The Belk family of stores consists of over 100 separate corporations that own and operate approximately 260 stores.[7] There was testimony that BDS is part of a group of 29 stores in seven states referred to as the "Belk–Simpson" group, headquartered in Greenville. These stores are deemed to be "affiliated," and inter-group loans are common. Robert Greiner is the Executive Vice President of this group and of BOS, and has "primary operating responsibility for that group of stores and would not have any office or responsibility in any other group of stores."

Greiner testified the Belk–Simpson headquarters had offices for buying, advertising, and accounting, and that he had "some systems people." However, an entity called "Belk Store Services" provides the group and other Belk groups with merchandising, private label inventory, "real estate services, information system services, legal services, accounting services, health insurance benefits, . . .—architecture, interior planning, things—things that would not make sense for us to be doing on our own, . . . ." He added that there were "cooperative monies available" for help with advertising and "fixturing", and for buyers.

---

6. Winston Way relied on figures from Dayton Hudson Corp.; Dillards Dept. Store; Federated Dept. Stores; Hudson's Bay Co.; Jacobson Stores Inc.; Kohl's Corp.; May Dept. Stores Co.; Mercantile Stores Co., Inc.; Nordstrom, Inc.; J.C. Penney Co., Inc.; Sears, Roebuck and Co.; Venture Stores, Inc.; Gottschalks, Inc.; and Proffitt's Inc. Andrew Clarkson used Dillards, Penney, Sears, and J.B. White.

7. The parties' briefs indicate the corporations have since merged.

Each Belk corporation is a member of Belk Stores Services. Each pays for its services, the finances for each corporation are maintained separately, and the other operating activities are separate. Greiner contrasted the Westgate Mall Belk with other Westgate department stores, explaining, "The primary difference is that each store has to stand on its own. Each store has—has an accountability to its own set of stockholders, its own board of directors. Each store has—has to fund their [sic] own operation."

Greiner maintained no Belk corporation got financial support from any other, except for the inter-group loans. However, prior to the merger in this case, BDS had merged with The Leader, a discount store in the Belk family of stores. According to Greiner, the merger occurred because "we knew that we would be expanding our store in Westgate Mall. There were assets in The Leader and assets in the Clinton corporation that could be used in the financing of the Westgate Mall expansion."

Similar reasoning was behind the merger that precipitated this case. The Belk Clinton corporation had closed a store in 1993, but had capital it was not actively using. It was determined that these funds could be used "to help the Spartanburg corporation." Leroy Robinson, associated with Belk in several capacities over 47 years, testified there have been other mergers in other Belk corporations in order to take loss carry-forwards and shelter against profits. However, he also testified there were situations where such a merger, although desirable, did not occur because of shareholder dissent. Robinson added that, unless a struggling corporation can find a merger partner or someone willing to contribute capital, that corporation "go[es] down the tube."

We believe the possibility of this kind of transaction regularly occurring connotes a closer relationship among Belk corporations than is admitted by BOS. However, we also agree with BOS's expert that "it still does not mean that in any way a stockholder of [BDS] is like being a stockholder in 300 stores scattered over . . . 12 or 13 states." We believe the one major consideration for our purposes is that the success or failure of the two stores that comprised BOS had a direct impact on its

shareholders, and that cannot be said for the large department store chains with which Thompson would like to compare it.

Thompson emphasized in her brief the benefits provided by Belk Store Services to BDS, but Woodside opined any benefit BDS derived from Belk Store Services would be reflected in BDS's financial statements. Although the evidence is in conflict on this issue, we defer to the trial judge who heard the testimony. *See Woodall v. Woodall,* 322 S.C. 7, 10, 471 S.E.2d 154, 157 (1996) ("[W]here evidence is disputed, the appellate court may adhere to the findings of the trial judge, who saw and heard the witnesses. The trial judge was in a superior position to judge the witnesses' demeanor and veracity and, therefore, his findings should be given broad discretion."). For these reasons, we hold the trial court properly relied on the valuation proposed by BOS's expert, Perry Woodside.

## B. *Woodside's Appraisal.*

### 1. *Post-merger debt:*

Thompson next argues the trial court "ignored very important information which called Dr. Woodside's 'conclusions' into serious question." Thompson first discusses the escalating BDS debt in the months prior to the merger due to the Westgate store expansion, but does not specify what she would have this court do with this information. However, we note Woodside utilized "total current liabilities" of $13,355,984 in his valuation dated as of October 5, 1996, and find this figure supported by the evidence.

### 2. *Westgate Mall lease:*

■ Thompson urges that BDS had a "sweetheart lease" in the Westgate Mall and that the trial court's valuation ignored its value. This contention is without merit. The Westgate Mall lease, entered in 1973, is for 40 years with two-ten year extensions. The lease does not charge rent, but BDS/BOS is required to pay common area maintenance, HVAC charges, security fees, and Merchant's Association dues, based on the store's square footage. Additionally, the lease provides for "overage rent" of 2.5% of all sales in excess of $25,000,000 per year.

In determining BDS's net asset value, Woodside depended on a real estate appraisal performed by an expert, James Robinson. Robinson valued the interest of the lease at $7,603,888. We have reviewed Robinson's report and find it reasonable. Further, Thompson offered no alternative value for the trial court's review. Therefore, as this was the only value before the court, we detect no error in its reliance thereon.

### 3. BDS's "Department Store Chain" reality:

Thompson argues BDS should be compared with other department store chains because the evidence demonstrates that BDS was "clearly" a member of a chain of department stores. We have dealt with this contention in our discussion above, but now address this issue as it applies to Woodside's valuation.

Woodside employed, in addition to the three methods approved by *Santee,* a "guideline public company value method." According to Woodside, this method "is based on the notion that various valuation multiples obtained from comparable publically traded companies can be applied to a privately-held company to estimate its value."

Woodside notes in his appraisal report that, "There were significant differences among [sic] the guideline companies and BOS in terms of capital structure, size, and growth rates in revenues and profits." In his testimony, Woodside observed that BOS, "in my view, is clearly and significantly different from owning stock in one of those large traded companies." In discussing this method, he acknowledged "there's great difficulty in even using this method.... [B]ut I went about it anyway and derived certain multiples and then adjusted them downward, based on my judgment, for the fact that we're dealing with a hugely different situation here." Later in his testimony, Woodside again mentioned "it's difficult to use market comparables when you're dealing with such a vastly different situation."

Even if we were to utilize this method of valuation, we would nevertheless assign it minimal weight. Although BOS has some of the structure of a large retail store chain because of its relationship to the other Belk corporations, its risks,

profits and debts are all its own; it succeeds or fails largely on its own, with little if any effect on the other corporations. Although the guideline company method may be applicable to all Belk corporations as a whole, we do not approve of its application to a two-store corporation. Our disposition of this issue is bolstered by Woodside's obvious discomfort with it, as evidenced by his testimony, and his extensive guesswork in applying this method to BDS.

*4. Profit potential:*

■ Thompson makes several points that she urges support the proposition that BDS would have been profitable in 1997, which fact should have positively affected the value of her stock. She notes especially the "sweetheart" lease, the Westgate store expansion, and the dominance of Belk stores in their markets. Thompson does not show this court how the trial court "ignored" these factors or how the trial court should have valued them. Nevertheless, we have our own difficulties with this aspect of Woodside's valuation.

■ Normally the demonstrated capacity of the corporation to earn money and pay dividends is very important in determining the value of its stock. *See Bell v. Kirby Lumber Corp.,* 413 A.2d 137 (Del.1980). Woodside valued BDS on this basis using the "discounted earnings" method. With the discounted earnings method, a company is valued according to the present value of the returns a stockholder might expect from owning the stock.

According to Woodside, for a closely-held company, the two critical elements in this method are (1) the cash flow forecasts and (2) the discount rate or required rate of return that is used to calculate the present value of the cash flows. Woodside felt it was improper to use historical cash flows because of the "changing market conditions in the BOS trade area." Woodside adjusted expected profitability from sales for depreciation expense and for asset and liability changes. Woodside used a rate of return based on market information for the large chain department stores, but adjusted this rate "for the small size and company-specific risks associated with BOS."

There was much testimony about the condition of the Spartanburg retail market. Hillcrest Mall, the site of BDS's other

store, was largely vacant and dilapidated. Before the Westgate store renovation, Westgate Mall had been sold and two additional "anchor" stores were to be added. Also, in 1995 plans were underway to build an outlet mall within Westgate's vicinity. Some manufacturers who supplied Belk were expected to open retail stores in the outlet mall. BOS's witnesses testified to the area being "overbuilt" and lamented how stiff competition would be among Spartanburg area retailers.

As a result of this situation, and because of Woodside's total dependence on projections, we give little credence to Woodside's figures in this calculation. *See Adams v. R.C. Williams & Co.*, 158 A.2d 797, 800 (Del.Ch.1960) ("An important purpose behind the practice of taking the average of several years earnings for the purpose of capitalizing earnings is to balance extraordinary profits and losses. Past experience represented by the actual figures are of prime importance." (citations omitted)). We also feel Woodside's need for "adjustments" takes the resulting figure too far from dependability. Accordingly, we only assign this valuation method 15% weight.

Thompson also notes several other factors: (1) BOS was, at the time of trial, operating at a loss; (2) BOS had suffered $900,000 in merchandise shrinkage in 1996; (3) the closing of the Hillcrest store by January 1998 would improve its "bottom line"; and (4) BOS would make its sales budget in 1997 "with a good Christmas season." These items, however, were only matters of speculation on October 5, 1996, and therefore consideration of them is barred. *See* S.C.Code Ann. § 33–13–101(3) (defining "fair value" as "the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, . . . .").

## C. *"Unreliable and Unreasonable Information".*

Thompson argues the trial court erred in basing its decision on "patently insupportable information." Again, we disagree.

### 1. *"Arm's length" transactions:*

Thompson asserts the trial court erred in relying on the stock transactions used by Woodside in determining BDS's market value because they were not "arm's length transactions." In arriving at a market value for BDS stock, Wood-

side utilized stock sales that occurred within ninety days of the BDS/Clinton merger. On July 17, 1996, the Belk Daughtridge Charitable Remainder Trust sold 17 shares to J.V. Properties for $1,474.99, 80% of book value. On August 28, 1996, the family of Sara Dew Misner and the Mabel Belk Dew Trust sold 121 shares to Gallant–Belk Company for the same price. In making its offer to the dissenters, BDS stated, "Both transactions were arms [sic] length."

Leroy Robinson testified the Belk Daughtridge Trust transaction was initiated by John Daughtridge family members who wished to sell their stock. John Daughtridge was a descendant of Belk founder John M. Belk. He added that Sara Misner was a descendant of John Belk, also, and that her family wished to sell its stock.

At trial Thompson elicited Woodside's agreement that "transactions between family members are generally less arm's length than, say, going to the stockbroker to buy stock."[8] Way opined that an arm's length transaction between family members would be "a highly dubious proposition." Clarkson testified he would be hesitant to rely on these transactions as an indication of fair value because he did not think they were at arm's length.

The evidence before us, however, indicates these transactions were fairly negotiated. Belk Daughtridge, a stockbroker, negotiated the transaction for the John Daughtridge family. John Daughtridge was a Belk director for a number of years and had been actively involved in the affairs of the corporations in which he held stock. Belk Daughtridge, his son, was also a director, and had worked for a number of years in the Belk organization. These negotiations took place over a period of several weeks.

Although Sara Misner and her husband initially handled the Misner sale, the Misner family eventually turned negotiations over to their son-in-law, James Baker, who was experienced in

8. Although Gallant–Belk Company, purchaser of the Misner family shares, is most likely one of the Belk family corporations, there is no indication in the record if J.V. Properties, purchaser of the Daughtridge family shares, has any affiliation to Belk descendants, although Leroy Robinson testified "Ralph Pitts, who was general counsel," handled these negotiations for the buyer. Because BOS did not argue otherwise, we will assume that J.V. Properties involves Belk descendants.

buying and selling businesses. It is true both negotiations were restricted by there being no ready market for these shares, but we believe we have adequately compensated for this fact by weighting market value accordingly.

### 2. Unaudited financial statements:

Thompson notes the financial statements upon which BOS relied in its appraisal were unaudited. Again, the trial court had no other figures before it. Thus, Thompson may not complain of the court's use of this information.

### D. Weighting.

 Appraisal is not an exact science, and the precise weight to be given to any factor is necessarily a matter of judgment for the court in the light of circumstances in each case. *Santee Oil Co.*, 265 S.C. 270, 217 S.E.2d 789. In arriving at his final valuation, Woodside weighted each of his four methods equally; the trial court adopted Woodside's weighting. Although we largely agree with Woodside's methods (except, of course, the guideline public company value method), because we have some qualms about his reasonings, we accordingly distribute the weighting differently than the trial court.

### 1. Discounted earnings method:

In our discussion above we have already determined to weight this method at 15%.

### 2. Market value:

 "The weight to be given market value is related to the nature and extent of the market in the stock and how fairly it reflects the judgment of informed buyers and sellers." *In re Tudor City Fifth Unit, Inc.*, 17 A.D.2d 794, 232 N.Y.S.2d 758, 760 (1962), *aff'd*, 13 N.Y.2d 812, 242 N.Y.S.2d 345, 192 N.E.2d 222 (1963). Each of the stores in the Belk organization is owned by a closely-held corporation; accordingly, there is no ready market for this stock. *Santee* instructs, " '[I]f there is no reliable established market value for the shares a reconstructed market, if one can be made, must be given consideration.' " *Santee Oil Co.*, 265 S.C. at 273, 217 S.E.2d at

791 (quoting *Chicago Corp. v. Munds,* 172 A. 452, 457 (Del.Ch. 1934)).

Three stock sales occurred in the nine months between the Clinton merger and the Leader merger:

| | | | |
|---|---|---|---|
| Page Renger | 1/31/96 | 12.5 shares | $1,702.58/share |
| John Belk Dughtridge | 7/17/96 | 17.0 shares | $1,474.99/share |
| Misner Family/Dew Trust | 8/28/96 | 121.0 shares | $1,474.99/share |

Woodside concluded, without discussion, that based on the last two transactions,[9] the market value of BOS was $1,474.99. We disagree, use all three transactions, and place the market value at $1,493.90.[10]

Although we are not fully comfortable in relying on a mere three trades, it is obvious from the record that these stocks were not traded frequently and, in fact, the *Santee* court used only one stock transaction in its market value determination. However, because of the infrequency of trades, we place less significance on the market value and accordingly assign it a weight of only 25%.

### 3. Net asset value:

In this case, we assign greatest weight to the net asset value because of the Westgate Mall renovation. The renovation began January 2, 1996. As of the end of the fiscal year on January 31, 1996, BDS's balance sheet reflected long term debt totaling $1,340,409. Woodside, in performing his calculations, relied on a balance sheet dated October 5, 1996 (the effective date of the merger), which reflected a $6,000,000 note to NationsBank and payables to affiliates totaling over $5 million. Obviously, BDS was using more than an average amount of its assets to expand and improve its business opportunities. This investment of course was not reflected in earnings at the time of the merger, and there was testimony

---

**9.** The trial court mistakenly noted Woodside applied "three recent arms-length transactions" in his determination of market value.

**10.** There was testimony regarding the Page Renger transaction, but no clear reason given for why her BDS stock was valued at $1,702.58. Leroy Robinson intimated Renger was paid more for her stock because it was part of a larger stock transaction, but he also stated both the John Daughtridge and the Sarah Misner families wished to sell all the stock they had in all Belk corporations.

that the Westgate store would not be profitable for four to five years. However, as Leroy Robinson testified: "I don't think the directors and shareholders would've agreed to make that investment if they had not felt, at long range, it would be profitable." We weigh asset value most heavily, therefore, " 'because it is this element at this time in the corporation's life that a very substantial portion of the intrinsic value of the shares is to be found.' " *Bell v. Kirby Lumber Corp.*, 413 A.2d 137, 145 (Del.1980) (quoting *Swanton v. State Guar. Corp.*, 215 A.2d 242, 245–46 (Del.Ch.1965)). Additionally, the Westgate Mall is essential to the ability of BOS/BDS to eventually generate earnings and pay dividends. We therefore weight net asset value at 60%.

E. *Resulting Total Valuation.*

Based on our discussion above, we arrive at the following valuation:

| | Determined Value/Share | Weight | Weighted Value/Share |
|---|---|---|---|
| Net Asset Value: | $1,474.21 | 0.60 | $ 884.53 |
| Discounted Cash Flow: | $1,606.93 | 0.15 | 241.04 |
| Market Value: | $1,493.90 | 0.25 | 373.48 |

**Final Determined Fair Value:** $1,499.05

Using this value, the value of Thompson's BDS stock on October 5, 1996, was $134,914.50 (90 × $1,499.05). Because BDS paid Thompson $132,749.10 on October 4, 1996, we find Thompson is due the additional sum of $2,165.40 from BDS.

### III. John Belk Deposition

 Thompson claims the trial court abused its discretion in denying her the opportunity to depose John Belk because he "was a critical witness and beyond the court's territorial trial subpoena power." Thompson complains BOS "specifically declined to name John Belk as a witness and did so only after the discovery deadline had terminated in order to prevent a deposition."

 The trial court's rulings on discovery matters will not be disturbed on appeal absent a clear abuse of discretion.

*Dunn v. Dunn,* 298 S.C. 499, 381 S.E.2d 734 (1989); *Beyer v. Metze,* 326 S.C. 356, 482 S.E.2d 789 (Ct.App.1997).

> The burden is upon the party appealing from the order to demonstrate the trial court abused its discretion.

> An "abuse of discretion" may be found by this Court where the appellant shows that the conclusion reached by the lower court was without reasonable factual support, resulted in prejudice to the right of appellant, and, therefore, amounted to an error of law.

*Dunn,* 298 S.C. at 502, 381 S.E.2d at 735 (citing *Darden v. Witham,* 263 S.C. 183, 209 S.E.2d 42 (1974)).

The scheduling order in this case provided "[n]on-expert discovery shall be completed no later than August 31, 1997." Discovery was to be deemed completed by September 15, 1997, "only if initiated at such time as to afford the responding party the full time provided under the applicable procedural rule in which to respond by the date set forth [herein]." The order further noted the case would likely be set for trial the week of October 27 or November 3, 1997.

BOS apparently served its interrogatory responses on Thompson on or after September 4, 1997. Not until October 7, 1997, did the dissenters notice John Belk's deposition for October 20, 1997; the trial was ultimately held on October 29–30, 1997. BOS objected to the deposition on the basis of its timing and because it had not listed John Belk as a witness.

On these facts, we find the trial court did not abuse its discretion. BOS notified Thompson in a timely manner of its witnesses; its interrogatory responses did not list John Belk as a witness, yet Thompson waited until a month later to notice his deposition. If Thompson had acted expeditiously, she could have deposed John Belk before September 15. If the deposition could not have been held prior to September 15, the scheduling order still provided Thompson would be afforded time to respond. Further, Thompson has not shown how she was prejudiced by the trial court's decision, as she failed to make a proffer of what John Belk's testimony would have been. *See TNS Mills, Inc. v. South Carolina Dep't of Revenue,* 331 S.C. 611, 503 S.E.2d 471 (1998) (where there was no proffer of excluded testimony, the court was unable to deter-

mine whether the complaining party was prejudiced by the refusal to admit the testimony into evidence).

## CONCLUSION

This court has conducted a thorough review of the record and finds the trial court's valuation was substantially supported by the evidence before it. However, based on our view of the preponderance of the evidence, we find Thompson due an additional $2,165.40 from her sale of BDS stock. We further affirm the trial court's decision to deny Thompson's deposition of John Belk.

**AFFIRMED AS MODIFIED.**

ANDERSON and STILWELL, JJ., concur.